**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

FILED

NOV - 5 2021

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

**PAMELA SMITH,**

**Plaintiff,**

v.

**CIVIL ACTION No. 2:21-cv-138**

**SCHOOL BOARD FOR THE CITY
OF NORFOLK, VIRGINIA, DR. SHARON
BYRDSONG, DANDRIDGE T.
BILLUPS, DR. DANIELLE BELTON,
EDNA FELTON, and JOHNAY BROWN,**

**Defendants.**

**MEMORANDUM OPINION AND ORDER**

Before the Court is a joint Motion to Dismiss the Amended Complaint ("Motion to Dismiss"), pursuant to the Federal Rules of Civil Procedure ("FRCP") Rule 12(b)(6), filed by Defendants School Board for the City of Norfolk, Virginia ("Norfolk School Board"), Dr. Sharon Byrdsong ("Dr. Byrdsong"), Dandridge T. Billups ("Mr. Billups"), Dr. Danielle Belton ("Dr. Belton"), Edna Felton ("Ms. Felton"), and Johnay Brown ("Ms. Brown") (collectively, "Defendants"). Def.'s Mot. Dismiss, ECF No. 20. The Court has considered the memoranda of the parties and this matter is now ripe for determination. *See* Def.'s Mem. Supp. Dismiss, ECF No. 21 ("Def.'s Mem. Supp."); Pl.'s Mem. Opp. to Def.'s Mot. Dismiss, ECF No. 23 ("Pl.'s Mem. Opp."); and Def.'s Reply to Pl.'s Mem. Opp. to Def.'s Mot. Dismiss, ECF No. 24 ("Def.'s Reply"). Upon review, the Court finds that a hearing on this Motion is not necessary. For the reasons stated herein, Defendants' Motion to Dismiss is **DENIED IN PART** and **GRANTED IN PART**.

1

## I. FACTUAL AND PROCEDURAL HISTORY

Relevant to Defendants' Motion to Dismiss and stated in the light most favorable to Plaintiff, the following facts are drawn from the Amended Complaint and attachments thereto. *See* Am. Compl., ECF No. 19.

Plaintiff Pamela Smith ("Plaintiff") is a former employee of Norfolk Public Schools ("NPS"). Am. Compl. ¶ 2. Specifically, Plaintiff was employed at Ghent Elementary School ("Ghent School") as a classified employee from October 2000 through September 16, 2020. *Id.* at ¶¶ 2, 12. Pursuant to Plaintiff's most recent employment contract, titled "Classified Personnel Contract" and dated May 30, 2020, Plaintiff was "in a probationary (employment at will) status for the first fifteen (15) weeks of employment if hired from outside the school system or given a new job within the school system." *Id.* at Ex. A ("Plaintiff's Contract"). During that "probationary period, the employee shall have no right to the administrative review procedures set forth in policies and regulations" of NPS. *Id.* Plaintiff's Contract also specified that she "may be dismissed for cause." *Id.* "Should [Plaintiff] file a written request for review within seven (7) working days after notification of the proposed dismissal is given, a review shall be granted." *Id.* The procedures for this review "shall be in accordance with applicable policies and regulations in effect at the time of the review." *Id.*

Plaintiff served as an office manager working for the principal in the front office of Ghent School. *Id.* at ¶ 13. Dr. Danielle Belton ("Dr. Belton") is an employee of NPS as the principal of Ghent School and was Plaintiff's direct supervisor during her employment. *Id.* at ¶¶ 6, 34. Throughout her employment, Plaintiff, as part of her position, "took and stored funds from teachers and programs, disbursed funds from the school safe at the direction of Dr. Belton, and performed other administrative and bookkeeping functions." *Id.* at ¶ 14. Pursuant to the Norfolk School Board

2

Policy, the principal "shall be responsible to insure that no money, unless placed in a suitable vault or safe, is left in the building overnight." *Id at* ¶¶ 37, 38 (citing Ex. C). Accordingly, Dr. Belton "formed and enforced the policies by which Ms. Smith was to keep track of the school safe, document [] incoming cash, generate receipts, disburse funds…, and document safe funds at Ghent School." *Id*. at ¶ 33.

On occasion, Dr. Belton "directed Ms. Smith to retrieve funds from the school safe and disburse them to teachers and/or administrative staff upon their respective requests, for various expenditures." *Id*. at ¶ 41. At other times, Dr. Belton instructed Plaintiff to perform various tasks with money from the school safe. *Id*. at ¶¶ 42-43. Dr. Belton allegedly "instructed Ms. Smith to use funds from the school safe to purchase food supplies for the teachers and staff without accounting for such funds." *Id.* at ¶ 42. Dr. Belton also, allegedly, "instructed Ms. Smith to provide Dr. Belton cash from the school safe." *Id.* at ¶ 43. In that instance, "Dr. Belton [allegedly] provided Ms. Smith receipts but no information relating to the use of such funds." *Id.* Plaintiff states that "Dr. Belton did not properly manage and insure the funds in the school, which she tasked Ms. Smith with handling." *Id*. at ¶ 44. Plaintiff accuses Dr. Belton, in "knowing her liability," of having "concocted a scheme to defame and terminate Ms. Smith." *Id*. at ¶ 45.

In December 2019, Plaintiff informed Dr. Belton that she would take Family Medical Leave Act ("FMLA") leave beginning in January 2020. *Id*. at ¶ 46. That same month, Plaintiff's FMLA leave was certified for January 15, 2020 through March 9, 2020. *Id*. at ¶¶ 48 (citing Ex. E), 53-54. In January 2020, prior to Plaintiff's FMLA leave departure date, Plaintiff attempted to finish work that had come in over the holiday break, which "was a yearly occurrence" at Ghent School. *Id.* at ¶ 49. Plaintiff told Dr. Belton what work she had left to do before taking leave and that she would like to have this work finished before she left. *Id*. at ¶¶ 51-52. Dr. Belton allegedly told

3

Plaintiff to "not worry" about the remaining tasks until she returned to work. *Id.* at ¶ 53. Plaintiff believes that Dr. Belton "intentionally instructed Ms. Smith to leave work uncompleted so that she would later be accused of violation of school board policy." *Id.* at ¶ 56. Plaintiff also believes that Dr. Belton, Ms. Felton, and Ms. Brown "used Ms. Smith's FMLA leave as an opportunity to pin Ms. Smith as a scapegoat for alleged financial inconsistencies that were caused by Dr. Belton's policies at Ghent [School]." *Id.* at ¶ 55.

While on FMLA leave, Dr. Belton and Ms. Brown, who works in the Human Resources Department, called Plaintiff repeatedly to assist with financial taskings. *Id.* at ¶¶ 8, 57. On February 24, 2020, Dr. Belton and Ms. Brown contacted Plaintiff several times "over the course of the day through multiple phone calls" and "inquired into the receipt book," asking "where the receipt book was kept, what type of receipts were in the book, inquiries about specific receipts, and other questions about receipts and records outside of the standard receipt book." *Id.* at ¶¶ 58-60. Plaintiff informed Ms. Brown that she would be better able to answer the questions in person, but she could not come to the school while on FMLA leave. *Id.* at ¶ 63. Ms. Brown allegedly called Plaintiff "half a dozen times, both for her own help and on behalf of Ms. Felton and Dr. Belton." *Id.* at ¶ 64. On March 4, 2020, while still on FMLA leave, Ms. Brown again contacted Plaintiff "regarding additional receipt records that were not typically kept in the receipt book." *Id.* at ¶ 66.

Plaintiff eventually learned that the receipt book inquiries were part of an audit and financial investigation into the financial records at Ghent School. *Id.* at ¶¶ 65-68, 71. In addition to the aforementioned conversations, over the course of her FMLA leave, Plaintiff received numerous other calls and texts from Ms. Brown, Dr. Belton, and Ms. Felton, not all of which Plaintiff answered. *Id.* at ¶ 69. Plaintiff believes Dr. Belton, Ms. Felton, and Ms. Brown forced her to perform functions of her position and some functions outside her position while she was on

FMLA leave. *Id*. at ¶¶ 73-74. In so doing, "Ms. Brown, Dr. Belton, and Ms. Felton required Ms. Smith to participate in the audit beyond de minimis contributions" during her FMLA leave. *Id*. at ¶ 72. Plaintiff alleges that these contacts affected her emotionally while she was recovering from surgery and "cost time while she was working pursuant to their requests." *Id.* at ¶¶ 75-76. Plaintiff believes that the contacts she received from Ms. Brown and Dr. Belton during her FMLA leave "advanced the retaliatory investigation into Ms. Smith." *Id.* at ¶ 77. Plaintiff also believes that the contacts and work performed during her leave would ultimately be used to terminate her employment at NPS. *Id.* at ¶¶ 83-86.

Plaintiff returned to work on March 9, 2020, but Dr. Belton "confronted" Plaintiff and instructed her to leave the premises in front of her coworkers. *Id*. at ¶¶ 92-93. That same day, Plaintiff was placed on paid administrative leave, pending the outcome of an official internal investigation of a financial matter at Ghent School. *Id.* at Ex. F. During the internal investigation, Ms. Brown instructed Plaintiff to remain off NPS properties unless granted permission. *Id.* Plaintiff believes that "during the investigation, "Ms. Felton[] and Ms. Brown accused Ms. Smith of embezzling and misappropriating funds." *Id*. at ¶ 105. Plaintiff alleges that she was placed on leave, in part, "because of the questioning she faced while on FMLA leave." *Id.* at ¶ 78. Plaintiff furthers that "[t]he records under investigation in this audit had previously been audited in July 2019 and no issues with Ms. Smith's performance or handling of funds had been found." *Id*. at ¶ 82. "Ms. Smith was never interviewed about the alleged practices and policies under audit and investigation." *Id*. at ¶ 88. Instead, she was "asked to supply information to Dr. Belton, Ms. Felton, Ms. Brown and NPS, all while on FMLA leave." *Id*. Plaintiff accuses Dr. Belton, Ms. Felton, and Ms. Brown of using Plaintiff's FMLA leave "as an opportunity to pin Ms. Smith as a scapegoat for alleged financial inconsistencies." *Id*. at ¶ 55.

5

As part of this scheme, Plaintiff alleges that, "[b]eginning on or about March 9, 2020, Dr. Belton forced teachers and staff at Ghent Elementary School to fill out forms asserting that Ms. Smith had mishandled receipts and embezzled funds." *Id*. at ¶ 107. Plaintiff alleges that the "forms Dr. Belton used were not standard forms and had never been used before." *Id.* at ¶ 109. Plaintiff accuses Dr. Belton of "draft[ing] the forms herself and the statements" that "Ms. Smith deliberately mishandled receipts." *Id.* at ¶ 110. In so doing, Plaintiff accuses Dr. Belton of "instructing teachers and staff, after the fact, to conclude that Ms. Smith was embezzling, despite each teacher or staff's personal knowledge of the facts." *Id*. at ¶ 118. The forms and other "defamatory statements ultimately cost Ms. Smith her employment by jumpstarting the termination process." *Id*. at ¶ 125.

In a letter dated June 29, 2020, Mr. Billups, who worked as the Executive Director of Human Resources, wrote to Plaintiff, stating that "a preponderance of information supports that you perpetrated embezzlement of the school funds which resulted in a loss of approximately $1,567.00." *Id*. at ¶ 130 (citing Ex. G). As a result, Mr. Billups informed Plaintiff that "the termination of [her] employment with NPS as an Office Manager II [would] be recommended to the Superintendent." *Id.* at Ex. G, 4. Pending the final outcome of her recommendation for termination, Plaintiff was advised that she would remain on paid administrative leave. *Id.* The letter also advised Plaintiff that she was "entitled to a meeting to discuss the recommendation of dismissal through a review process." *Id.* To request a review, Plaintiff was informed that she must provide written notice to Mr. Billups within seven business days of the receipt of the letter, which was on or before July 9, 2020. *Id.* The June 29, 2020 letter was published to Plaintiff's former coworkers, the Superintendent, and the Norfolk School Board. *Id*. at ¶ 131.

On August 4, 2020, Mr. Billups sent Plaintiff a second letter, via email, confirming receipt of her request for a meeting to discuss the proposed recommendation of dismissal, which Plaintiff's

6

attorney sent on her behalf. *Id.* at Ex. H. The letter informed Plaintiff that the review meeting would be held on August 11, 2020. *Id.* The letter noted that Mr. Billups received a written document that Plaintiff's attorney submitted on her behalf "in response to the investigation findings as outlined in the June 29, 2020 letter." *Id.* Although the letter stated that Plaintiff's "attorney's advocacy via the written document" would be considered as part of the record in review, "further participation by [Plaintiff's] attorney [would] not be allowed in the review" because it "is not a hearing." *Id.* Therefore, although Plaintiff requested that counsel be present at this review, "Mr. Billups on behalf of NPS denied Ms. Smith representation of counsel at her review hearing." *Id.* at ¶ 141. Instead, Plaintiff was told that she would "have the opportunity to speak for [herself] during the review of the reasons for [her] proposed dismissal." *Id.* at Ex. H.

On August 31, 2020, Mr. Steven Jenkins ("Mr. Jenkins"), Chief Finance Officer who served as the Superintendent's designee in conducting Plaintiff's review, sent Plaintiff a letter via email. *Id.* at Ex. I. The letter noted that, on August 10, 2020, Mr. Billups received a communication from Plaintiff's attorney informing Mr. Billups that "the written documentation that had been submitted on [Plaintiff's] behalf refuting the allegations should become part of the record, and that [Plaintiff] had no further statements to add." *Id.* at 1. This communication "informed that [Plaintiff] would not attend the previously scheduled review meeting." *Id.* Plaintiff alleges that "Mr. Mungo, the City Attorney," told Plaintiff that "her testimony at the review would be turned over to the Commonwealth Attorney's office for potential prosecution." *Id.* at ¶ 142. Plaintiff contends that she did not attend the review because she was "not permitted to have counsel participate" and she believed "there were criminal ramifications of the review." *Id.* at ¶ 145. Plaintiff "is unaware of whether a review ever actually happened." *Id.* at ¶ 146. Ultimately, the August 31, 2020 Letter from Mr. Jenkins also informed Plaintiff that Mr. Jenkins had "reviewed the report prepared by

7

Edna Felton, School Activity Fund Audit Coordinator, [] Beverly Allgood, Business Systems Compliance Auditor," and Plaintiff's attorney. *Id.* at Ex. I, at 1. Mr. Jenkins listed six findings based on his review and concluded that "there are adequate grounds for dismissal of [Plaintiff's] employment from NPS." *Id.* at Ex. I, at 1-3.

On September 15, 2020 at 6:00 pm, Dr. Byrdsong, "the Superintendent of Norfolk Public Schools, informed Ms. Smith that her termination would be decided at a School Board meeting on September 16, 2020." *Id.* at ¶¶ 150-53. Accordingly, Plaintiff had approximately 24-hour notice of her termination meeting. *Id.* Plaintiff prepared and submitted a public comment contesting her termination, however, "[t]his comment was not read into the meeting." *Id.* at ¶¶ 157-58. Plaintiff alleges that Dr. Byrdsong gave her this notice "only after the deadline for public comment had passed for that meeting." *Id.* at ¶ 154. Plaintiff was later "informed that the comment would be read on September 23, 2020," days after the termination meeting, at which point "[Plaintiff] retracted her comment as it would be entirely worthless post-termination." *Id.* at ¶ 159. Plaintiff "was never presented the opportunity to present witnesses, nor to be represented by legal counsel at any hearing or other in-person review." *Id.* at ¶ 167. Plaintiff was ultimately terminated after the September 16, 2020 meeting; however, Plaintiff never received a formal notice of termination. *Id.* at ¶¶ 161-63.

Plaintiff accuses Defendants of failing to follow the separation procedures outlined by Norfolk Public Schools and the Virginia Code. *Id.* at ¶¶ 165-174. Plaintiff further accuses Defendants of violating Plaintiff's due process rights under the U.S. and Virginia Constitutions. *Id.* at ¶¶ 175-181. Specifically, Plaintiff asserts six counts against Defendants:

Count 1.  Interference with Family and Medical Leave (*Id.* at ¶¶ 185-197)

Count 2.  Retaliation for Taking Family and Medical Leave Act Leave (*Id.* at ¶¶ 198-213)

     Count 3.    Defamation *Per Se* (*Id.* at ¶¶ 214-243)

     Count 4.    Violation of 42 U.S.C. Section 1983 (*Id.* at ¶¶ 244-256)

     Count 5.    Wrongful Termination in Contravention of Public Policy (*Id.* at ¶¶ 257-266)

     Count 6.    Breach of Contract (*Id.* at ¶¶ 267-279)

Plaintiff sues the School Board for the City of Norfolk for Counts I, II, IV, V, and VI. *Id.* at ¶ 3. Plaintiff sues Mr. Billups (Counts II and III), Dr. Belton (Counts I-III), Ms. Felton (Count I), and Ms. Brown (Count I) in both their individual and official capacities. *Id.* at ¶¶ 5-8. Plaintiff sues Dr. Byrdsong (Count V) only in her official capacity. *Id.* at ¶ 4.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of actions that fail to state a claim upon which relief can be granted. For the purposes of a Rule 12(b)(6) motion, courts may only rely upon the complaint's allegations and those documents attached as exhibits or incorporated by reference. *See Simons v. Montgomery Cnty. Police Officers*, 762 F.2d 30, 31 (4th Cir. 1985). Courts will favorably construe the allegations of the complainant and assume that the facts alleged in the complaint are true. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). However, a court "need not accept the legal conclusions drawn from the facts," nor "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Mkts., Inc., v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).

A complaint need not contain "detailed factual allegations" in order to survive a motion to dismiss, but the complaint must incorporate "enough facts to state a belief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). This plausibility standard does not equate to a probability requirement, but it entails more than a mere possibility that a defendant has acted unlawfully. *Ashcroft v. Iqbal*,

129 S. Ct. 1937, 1949-50 (2009). Accordingly, the plausibility standard requires a plaintiff to articulate facts that, when accepted as true, demonstrate that the plaintiff has stated a claim that makes it plausible he is entitled to relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 129 S. Ct. at 1949, and *Twombly*, 550 U.S. at 557). To achieve factual plausibility, plaintiffs must allege more than "naked assertions ... without some further factual enhancement." *Twombly*, 550 U.S. at 557. Otherwise, the complaint will "stop[ ] short of the line between possibility and plausibility of entitlement to relief." *Id.*

## III. DISCUSSION

Pursuant to Rule 12(b)(6), Defendants move to dismiss each count of the Amended Complaint for failure to state a claim upon which relief can be granted. Def.'s Mot. Dismiss, ECF No. 20. In determining whether each count is plausibly pled, the Court will assess whether the Amended Complaint states sufficient facts in support of the underlying elements for each offense.

### A. Federal Question & Supplemental Jurisdiction

As an initial matter, a federal district court has federal question jurisdiction over an action pursuant to 28 U.S.C. §§ 1331, 1343. *See Davis v. Passman*, 442 U.S. 228, 228 (1979) (recognizing that 28 U.S.C. § 1331(a) "confer[s] original jurisdiction on federal district courts of all civil actions wherein the matter in controversy exceeds the sum or value of $10,000 and arises under the Federal Constitution"); *see also, Bell v. Hood*, 327 U.S. 678, 681–85 (1946). In claims arising out of federal law, the Court will apply federal law.

Moreover, with respect to claims arising out of state law, a district court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), if the claims are "so related" to the claims invoking federal question jurisdiction-invoking claim "that they form part of the same case or controversy under Article III." *See Wisconsin Dep't of Corr. v. Schacht*, 524 U.S. 381, 387 (1998)

10

("supplemental jurisdiction allows federal courts to hear and decide state-law claims along with federal-law claims when they 'are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy'") (citing to § 1367); *see also, Hales v. Winn–Dixie Stores, Inc.,* 500 F.2d 836, 848, n. 12 (4th Cir.1974) (stating that supplemental jurisdiction does not encompass claims when one count is "separately maintainable and determinable without any reference to the facts alleged or contentions stated in or with regard to the other count"); *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725 (1966) (explaining that federal courts may exercise supplemental jurisdiction over additional state claims if they arose out of "a common nucleus of operative fact" and setting out the constitutional limits of federal supplemental jurisdiction).[1]

In claims arising out of supplemental jurisdiction, district courts apply federal procedural law and state substantive law. *See Gasperini v. Ctr. For Humanities, Inc.*, 518 U.S. 415, 427 (1996); *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 92 (1938) (Reed, J., concurring in part) ("[N]o one doubts federal power over procedure."); *Guaranty Trust Co. v. York,* 326 U.S. 99, 109 (1945) ("when a federal court exercises diversity or pendent jurisdiction over state-law claims, the outcome of the litigation should be the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court"); *see also, Mason and Dixon Intermodal, Inc. v. Lapmaster Intern. LLC*, 632 F.3d 1056, 1060 (9th Cir. 2011) ("When a district court sits in

---

[1] Pursuant to 28 U.S.C.A. § 1367(c), the Court may decline to exercise supplemental jurisdiction if:
    (1) the claim raises a novel or complex issue of State law,
    (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
    (3) the district court has dismissed all claims over which it has original jurisdiction, or
    (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

Generally, however, state tort claims are not considered novel or complex. *See, e.g., Parker v. Scrap Metal Processors, Inc.,* 468 F.3d 733, 743 (11th Cir. 2006); *INX Intern. Ink Co. v. Delphi Energy & Engine Management Systems,* 943 F.Supp. 993, 997 (E.D. Wis. 1996) (holding that negligence, nuisance, and property damage claims have been held as not raising novel or complex issues of state law).

Case 2:21-cv-00138-RAJ-LRL Document 26 Filed 11/05/21 Page 12 of 50 PageID# 369

diversity, or hears claims based on supplemental jurisdiction, the court applies state substantive law to the state law claims"); *Barton v. Clancy*, 632 F.3d 9, 17 (1st Cir. 2011) ("A federal court exercising supplemental jurisdiction must apply state substantive law to the claim").

In this case, as detailed below, the Court has federal question jurisdiction pursuant to the Family Medical Leave Act and 42 U.S.C. § 1983. The state law claims alleged in the complaint arise from the same set of facts that serve as the basis for the federal law claims. Since the Court finds that Plaintiff asserts a viable federal claim, as discussed *infra*, the Court has federal question jurisdiction over Plaintiff's federal claims and supplemental jurisdiction to consider the remaining state law claims.

**B. Official and Individual Capacity Claims**

As previously stated, Plaintiff sues the School Board for the City of Norfolk on Counts I, II, IV, V, and VI. Am. Compl. ¶ 3. Plaintiff sues Mr. Billups (Counts II and III), Dr. Belton (Counts I-III), Ms. Felton (Count I), and Ms. Brown (Count I) in both their individual and official capacities. *Id.* at ¶¶ 5-8. Plaintiff sues Dr. Byrdsong (Count V) only in her official capacity. *Id.* at ¶ 4. In the instant Motion to Dismiss, Defendants assert challenges to the official capacity claims, and to the individual capacity claims based on qualified immunity. *See* Def.'s Mem. Supp.

1. Official Capacity Claims

Defendants argue that Plaintiff's federal claims (Counts I, II, and IV) against the individual Defendants in their official capacities "must be dismissed as duplicative of the claims against the School Board." *Id.* at 7 (referencing Am. Compl. ¶¶ 5-8). Plaintiff, in opposition, states that Counts I, II, and IV "are against those Defendants in their individual capacity and against the School Board as the entity, therefore [sic] there are no duplicative claims." Pl.'s Mem. Opp. 6. While the Court notes that this statement is inconsistent with the preliminary paragraphs of Plaintiff's Amended

Complaint, – which name Mr. Billups, Dr. Belton, Ms. Felton, and Ms. Brown as liable "in [their] official capacit[ies] [sic], or, in the alternative, in [their] individual capacit[ies]" – Plaintiff nonetheless indirectly concedes to the duplicity of the official capacity claims. *See* Am. Compl. ¶¶ 5-8; *cf.* Pl.'s Mem. Opp. 6. Further, the actual allegations set out in Counts I, II, and IV appear to only make allegations against the individual Defendants in their individual capacities. *See* Am. Compl. ¶¶ 187, 197, 200 (naming the School Board and then, "in the alternative," alleging that the individual Defendants "act[ed] outside the scope of their employment and in their respective individual capacities"). Setting aside the inconsistencies within the Amended Complaint, the Court nonetheless finds that any claims brought against the individual Defendants in their official capacities are duplicative of those also alleged against the School Board. *See Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004) (holding that the district court correctly dismissed plaintiff's claims against public officials in their official capacities as duplicative, but permitted claims against them in their individual capacities) (citing *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)). Therefore, the Court will dismiss in part the claims alleged in Counts I, II, and IV against Mr. Billups, Dr. Belton, Ms. Felton, and Ms. Brown in their official capacities.

Further, Plaintiff names Dr. Byrdsong, in her official capacity "as an agent and officer of the city of Norfolk Public Schools," as having wrongfully terminated her in contravention of public policy. Am. Compl. ¶ 4. Defendants argue that this claim against Dr. Byrdsong is duplicative of the claim against the School Board and that Count V makes no mention of Dr. Byrdsong at all; therefore, they argue, she should be dismissed as a party to this claim. Def.'s Mem. Supp. 7, 23-24. Plaintiff does not respond to this argument. Indeed, she does not mention Dr. Byrdsong in her opposition paper at all. *See* Pl.'s Mem. Opp. For the same reasons stated above, the Court finds that this claim is duplicative. *See Love-Lane*, 355 F.3d at 783. Moreover, since Plaintiff did not

respond to Defendants' argument, the Court has discretion to treat that argument as conceded and finds it proper to do so here. *See Burke v. CHS Middle E., LLC*, No. 1:18-CV-01605-LO-JFA, 2019 WL 459022, at \*5 (E.D. Va. Feb. 4, 2019); *Chamblee v. Old Dominion Sec. Co., L.L.C.*, *et al.*, No. 3:13CV820, 2014 WL 1415095, at \*8 (E.D. Va. Apr. 11, 2014) (noting that when a plaintiff addresses only some, not all, arguments in opposition to a motion to dismiss, a court may treat those unaddressed arguments as conceded). Accordingly, Dr. Byrdsong is dismissed as a party to Count V and, since that is the only claim against her, from the complaint entirely.

## 2. Individual Capacity Claims: Qualified Immunity Defense

Additionally, Defendants contend that Mr. Billups, Dr. Belton, Ms. Felton, and Ms. Brown are entitled to qualified immunity for the FMLA claims asserted against them in their individual capacities. Def.'s Mem. Supp. 7. They argue, specifically, that "[p]ersonal liability of public employees for FMLA claims was not clearly established at the time of the alleged conduct as opposed to the specific right." *Id.* at 8 (citing *Modica v. Taylor*, 465 F.3d 174, 188 (5th Cir. 2006); *Fields v. Trollinger*, 2011 WL 3422689 (W.D.N.C. March 28, 2011); and *Ainsworth v. Loudoun County School Bd.*, 851 F.Supp.2d 963, 972 (E.D. Va. 2012)).

Since qualified immunity is "an immunity from suit rather than a mere defense to liability...it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Indeed, the "driving force" behind the creation of the qualified immunity doctrine was to ensure that "'insubstantial claims' against government officials be resolved prior to discovery." *Anderson v. Creighton*, 483 U.S. 635, 640, n. 2 (1987). Accordingly, the Supreme Court has repeatedly stressed "the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 US. 224, 227 (1991) (*per curiam*). It is therefore appropriate to consider and, if possible, to resolve qualified immunity questions at this stage.

### *i. Qualified Immunity Standard*

Qualified immunity provides that government officials performing discretionary functions generally are shielded "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullinex v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle v. Howards*, 132 S.Ct. 2088, 2093 (2012)). Generally, if the law is clearly established, "a reasonably competent public official should know the law governing his conduct." *Harlow*, 457 U.S. at 818-19. "Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate." *Id.* at 819. However, "the public interest may be better served" by independent action taken without fear of consequences "where an official's duties legitimately require action in which clearly established rights are not implicated." *Id.* "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011). Put simply, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Mullinex*, 577 U.S. at 12 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Qualified immunity is an affirmative defense and must be plead by the defendant. *Crawford-El v. Britton*, 523 U.S. 574, 587 (1998) (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)). Rule 8(c) of the Federal Rules of Civil Procedure states that "a party shall set forth affirmatively . . . any matter constituting an avoidance or affirmative defense." FED. R. CIV. P. 8(c). The court will not impose upon the plaintiff the obligation of anticipating the qualified

immunity defense, and "it is for the official to claim that his conduct was justified by an objectively reasonable belief that it was lawful." *Gomez*, 446 U.S. at 640.

### ii. Qualified Immunity for FMLA Claims

The question whether a public employee sued in his or her individual capacity is entitled to qualified immunity directly[2] under the FMLA has not been addressed by the Fourth Circuit. In *Knussman v. Maryland*, the Fourth Circuit addressed a case where this issue was raised at the district court level, but not on appeal. 272 F.3d 625, 632 (4th Cir. 2001). There, the plaintiff brought a claim that, *inter alia*, several individual employees of the Maryland State Police violated his rights under the FMLA, for which he sought recourse both under 42 U.S.C. § 1983 and directly under the statute. *Id.* at 627. The district court held that all of the individual defendants sued in their individual capacities were entitled to qualified immunity from the FMLA claim because the rights deriving from the relationship between paid leave under state law and the FMLA were not clearly established. *Knussman v. State of Md.*, 16 F. Supp. 2d 601, 610 (D. Md. 1998). However, that issue was not raised on appeal. *Knussman*, 272 F.3d at 627.

Only two circuit courts, the Fifth and the Eighth, have addressed this issue. The Fifth Circuit has repeatedly analyzed the qualified immunity defense raised by public employees sued in their individual capacities for FMLA violations. *See, e.g.*, *Bryant v. Texas Dept. of Aging and Disability Services*, 781 F.3d 764, 770-71 (5th Cir. 2015) (holding, on appeal of summary judgment, that a public employee was entitled to qualified immunity from an FMLA interference claim); *Bellow v. LeBlanc*, 550 Fed. Appx. 181, 184 (5th Cir. 2013) (holding, on appeal of a motion to dismiss, that a public employee was not entitled to qualified immunity from an FMLA

---

[2] This issue is distinct from whether a public official is entitled to qualified immunity from a 42 U.S.C. § 1983 claim that alleges an FMLA violation within it. *See, e.g.*, *Diaz v. Michigan Dept. of Corrections*, 703 F.3d 956 (6th Cir. 2013) (state employees filed a § 1983 action to enforce FMLA rights).

16

discrimination claim); *Modica v. Taylor*, 465 F.3d 174, 179-80, 187-88 (5th Cir. 2006) (holding, on appeal of summary judgment, that a public employee was entitled to qualified immunity from an FMLA retaliation claim). The Eighth Circuit has only addressed this issue once, briefly, on appeal of summary judgment. *See Darby v. Bratch*, 287 F.3d 673, 681 (8th Cir. 2002) ("This [defense of qualified immunity] argument is without merit. The Family and Medical Leave Act creates clearly established statutory rights, including the right to be free of discrimination or retaliation on account of one's exercise of leave rights granted by the statute."). Notably, the Eighth Circuit mentioned that the individual defendants did not argue that "they should [have] receive[d] qualified immunity because of uncertainty over the individual liability of public officials." *Id.* at 681, n. 13.

Other circuits have acknowledged, but not reached the merits of the issue. *See, e.g.*, *Queen v. City of Bowling Green, Kentucky*, 956 F.3d 893, 896 (6th Cir. 2020) (issue of qualified immunity defense to FMLA claim raised with the district court but not on appeal); *Walker v. City of Pocatello, Idaho*, 764 Fed.Appx. 646, 647 (9th Cir. 2019) (concluding the district court was not required to analyze the qualified immunity issue for individual defendants because the claims would only proceed against the city); *Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 246-47 (3rd Cir. 2016) (concluding that because plaintiffs failed to show a violation of federal law, it need not reach the issue of qualified immunity); *Gray v. Baker*, 399 F.3d 1241 (10th Cir. 2005) (concluding it lacked jurisdiction over the qualified immunity issue because it was not properly raised as a defense); *Wascura v. Carver*, 169 F.3d 683, 685, 687 (11th Cir. 1999) (concluding it lacked subject matter jurisdiction over the FMLA claim).

This Court has not yet addressed the specific issue in the context of qualified immunity,[3] but several other district courts within the Fourth Circuit have. *See Meyer v. Town of Wake Forest*, No. 5:16-CV-348-FL, 2018 WL 4689447, at \*14-15 (E.D.N.C. Sept. 28, 2018) (holding, on a motion for summary judgment, that public employees sued in their individual capacities were entitled to qualified immunity from an FMLA retaliation claim where plaintiff's right to take his family to the beach or fair was not clearly established); *Fields v. Trollinger*, No. 1:10CV296, 2011 WL 3422689, at \*8-9 (W.D.N.C. Mar. 28, 2011), *report and recommendation adopted*, No. 1:10CV296, 2011 WL 3421489 (W.D.N.C. Aug. 4, 2011) (holding, at the motion to dismiss stage, that public officials sued in their individual capacities were entitled to qualified immunity from FMLA claims where the potential for personal liability under the statute was not clearly established); *Abbott v. Maryland Corr. Enterprises*, No. CV AMD 06-447, 2007 WL 9780500, at \*4 (D. Md. Mar. 17, 2007) (holding that public officials sued in their individual capacities were entitled to qualified immunity from FMLA claims where the potential for personal liability under the statute was not clearly established (citing *Modica*, 465 F.3d at 188)); *Knussman*, 16 F.Supp.2d at 610-11 (holding that public officials sued in their individual capacities were entitled to qualified immunity from an FMLA claim where the rights deriving from the relationship between paid leave under state law and the FMLA were not clearly established).

### iii. Application to Plaintiff's Case

Defendants argue that they are entitled to qualified immunity from the FMLA claims in their individual capacities because "[p]ersonal liability of public employees for FMLA claims was not clearly established at the time of the alleged conduct as opposed to the specific right." Def.'s

---

[3] Both parties cite to *Ainsworth v. Loudoun County School Bd.*, 851 F.Supp.2d 963 (E.D. Va. 2012) in their position papers. However, *Ainsworth* only addresses whether public employees can be personally liable for an FMLA claim, not whether they are entitled to a qualified immunity defense to an FMLA claim when sued in their individual capacities. Here, Defendants raise the personal liability issue within the qualified immunity defense.

Mem. Supp. 7 (citing *Modica*, 465 F.3d at 188; *Trollinger*, 2011 WL 3422689). However, Defendants confuse the "clearly established" prong by raising the issue of personal liability instead of whether the *right* alleged to be violated was clearly established. As previously stated, qualified immunity shields government officials from liability so long as "their *conduct* does not violate *clearly established* statutory or constitutional *rights* of which a reasonable person would have known." *Pearson,* 555 U.S. at 231 (emphasis added). A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullinex*, 577 U.S. at 11. In short, the question is whether the *right* at issue was clearly established, not whether the liability for violating that right was clearly established.

The rights allegedly violated in the Amended Complaint, and challenged by Defendants on qualified immunity grounds, are twofold: the right protecting against interference with FMLA leave and the right protecting against retaliation from an employee's decision to take FMLA leave. Am. Compl. ¶ 1. Both rights derive from the FMLA statute, which outlines "prescriptive" rights – interference and entitlement – and "proscriptive rights, such as retaliation and discrimination. *See Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 546 (4th Cir. 2006). Specifically, with regard to prescriptive rights, the statute states that it "shall be unlawful for any employer to *interfere* with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C.A. § 2615(a)(1) (emphasis added). As for proscriptive rights, the statute provides that it "shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." *Id.* at (a)(2). These rights are clearly established. *See Yashenko*, 446 F.3d at 546; *Adams v. Anne Arundel Cty. Pub. Sch.*, 789 F.3d 422, 427 (4th Cir. 2015) (outlining the requirements for proving

19

an FMLA interference claim); *Waag v. Sotera Def. Solutions, Inc.*, 857 F.3d 179, 191 (4th Cir. May 16, 2017) (outlining the requirements for proving an FMLA retaliation claim).

Defendants, however, contend they are immune from suit because their *liability* for violating these rights was not clearly established. Def.'s Mem. Supp. 7. Contrary to Defendants' contention, if the *right* at issue is clearly established, the appropriate inquiry is whether "a reasonable person would have known" that their conduct violated that right. *Pearson,* 555 U.S. at 231. Since qualified immunity is an affirmative defense, "it is for the official to claim that his conduct was justified by an objectively reasonable belief that it was lawful." *Gomez*, 446 U.S. at 640. The "objectively reasonable belief" asserted by Defendants, ultimately, is not that interference of or retaliation for Plaintiff's FMLA leave, assumed to be true, was lawful, but rather that they would not be held individually responsible for doing so. The standard here, therefore, is not whether the individual Defendants' liability was "clearly established," but rather whether their belief that they were not liable was "reasonable." The Court finds it was not.

As previously stated, if the law is clearly established, "a reasonably competent public official should know the law governing his conduct." *Harlow*, 457 U.S. at 818-19. At this stage in the litigation, it appears that Defendants were well-aware of the law governing their conduct for several reasons. First, as Plaintiff points, out, Dr. Belton provided Plaintiff with the paperwork she needed to take FMLA leave, which outlined the rights and procedures to which Plaintiff was entitled under the statute. Pl.'s Mem. Opp. 7 (referencing Am. Compl., Ex. E). Indeed, Dr. Belton signed Plaintiff's FMLA leave request paperwork. Am. Compl., Ex. E, at 1. Mr. Billups, via email, notified Plaintiff that he had received and acknowledged her request for an extension of FMLA leave. *Id.* at 11. In that email, Mr. Billups also identified Ms. Brown, who worked in Human Resources, as someone who was available to "assist" Plaintiff further with her "FMLA matter."

20

*Id.* Therefore, at a minimum, the individual Defendants were aware that it was unlawful to interfere with Plaintiff's FMLA leave and to retaliate against her for taking FMLA leave. Nonetheless, assuming the facts alleged in the Amended Complaint to be true at this stage in the litigation, all Individual Defendants still interfered with and/or retaliated against Plaintiff for taking FMLA leave.

Second, even if awareness is insufficient, this Court interprets the FMLA to plainly include individual suits against a public employee. Defendant contests this by referring to this Court's decision in *Ainsworth*, 851 F. Supp. 2d at 973. However, there, the Court specifically found that public employees could be sued in their individual capacities for FMLA violations. *Id.* ("It therefore follows from a plain reading of the statute that if a public employee 'acts, directly or indirectly, in the interest of an employer,' she too falls within the FMLA's definition of employer, and thus, may be held liable in her individual capacity.") (citing *Modica*, 465 F.3d at 184). That Defendants were aware of this Court's position regarding their liability indicates that they reasonably should have known that they could be held personally liable for violating Plaintiff's FMLA rights. Therefore, Dr. Belton, Mr. Billups, Ms. Felton, and Ms. Brown can all be held personally liable for violations of the FMLA.[4]

Third, this Court has found that individuals can be held personally liable for FMLA violations as early as 2011. *Weth v. O'Leary*, 796 F.Supp.2d 766, 774-777 (E.D. Va. 2011) (engaging in the same analysis as the court in *Ainsworth* and concluding that public officials can be held individually liable for FMLA violations); *Ainsworth*, 851 F. Supp. 2d at 973. While the court in *Weth* acknowledged the split in authority on this issue, it also noted that most district courts nationwide have concluded that public employee supervisors can be sued individually under

---

[4] Defendants also make this qualified immunity argument in support of dismissing Count II. For the same reasons stated above, Defendants' contention is without merit.

the FMLA. *Weth*, 796 F.Supp.2d at 776 (citing *Cantley v. Simmons*, 179 F.Supp.2d 654, 656 (S.D.W.Va. 2002) and *Kilvitis v. Cnty. Of Luzerne*, 52 F.Supp.2d 403, 412-13 (M.D. Pa. 1999) (collecting cases)). In fact, the cases Defendants themselves cite in favor of their position support the opposite conclusion. *See Modica*, 465 F.3d at 187 ("[The] plain language of the FMLA permits public employees to be held individually liable."). Therefore, any "objective belief" Defendants held that they could not be held liable was unreasonable. *Pearson,* 555 U.S. at 231; *Gomez*, 446 U.S. at 640. Accordingly, Defendants are not entitled to qualified immunity from claims brought directly under the FMLA against them in their individual capacities.

\*    \*    \*

For the foregoing reasons, Defendants' Motion to Dismiss Counts I, II, and IV is **GRANTED** in so far as they assert claims against Mr. Billups, Dr. Belton, Ms. Felton, and Ms. Brown in their official capacities. The Motion to Dismiss Count V is also **GRANTED** in so far as it makes allegations against Dr. Byrdsong. Accordingly, Dr. Byrdsong is **DISMISSED** as a party to Count V and, since that is the only claim against her, to the complaint entirely. However, because the individual Defendants are not entitled to qualified immunity from FMLA claims, the Motion to Dismiss Counts I and II is **DENIED** in so far as they assert claims against Defendants in their individual capacities.

## C. Count One – Interference with Family and Medical Leave

Plaintiff accuses the Norfolk School Board, and Dr. Belton, Ms. Felton, and Ms. Brown, in their individual capacities, of interfering with Plaintiff's scheduled FMLA leave. *See* Am. Compl. ¶¶ 3, 6-8, 186. Specifically, Plaintiff accuses Defendants Dr. Belton, Ms. Felton, and Ms. Brown, of acting beyond the scope of their employment, in their individual capacities, to force Plaintiff to engage in work that was more than *de minimus* while on FMLA leave. *Id.* at ¶¶ 72,

22

187. Plaintiff has a federal right to sue for violations of 29 U.S.C. § 2615(a) (the federal statute for interference with FMLA rights) pursuant to 29 U.S.C. § 2617(a)(1) (the federal statute for civil liability). To plead a claim for interference under the FMLA, a plaintiff must demonstrate (1) entitlement to an FMLA benefit; (2) that plaintiff's employer interfered with a provision of that benefit; and (3) that the interference caused harm. *Adams v. Anne Arundel Cty. Pub. Sch.*, 789 F.3d 422, 427 (4th Cir. 2015). Defendants do not dispute that Plaintiff was entitled to FMLA benefits. Indeed, Plaintiff was approved for FMLA leave and ultimately took the leave January 15, 2020 through March 9, 2020. The parties diverge, however, as to whether Defendants' conduct gave rise to material interference and, if so, whether that interference caused harm.

Plaintiff alleges that she was forced to participate in the audit during her FMLA leave. To support this claim, Plaintiff states that Ms. Brown called Plaintiff "half a dozen times," Dr. Belton called and texted Plaintiff "numerous times," and Ms. Brown called on behalf of Ms. Felton at times. Am. Compl. ¶¶ 64-69. Defendant argues that "Plaintiff has only alleged *de minimis* contact during her FMLA leave," which, in Defendants' view, "has been ruled appropriate and does not constitute FMLA interference." ECF No. 21 at 10-11. Defendants rely upon *Antekeier v. Lab. Corp. of Am.*, in support of their position; however, *Antekeier* was before the Court on a summary judgment motion, not a Rule 12 motion to dismiss. 295 F. Supp. 3d 679 (E.D. Va Feb. 8, 2018). In that case, the Court found that "several" calls placed to that plaintiff during FMLA leave did not amount to interference, but instead reflected a "professional courtesy." *Id.* at 684. The *Antekeier* Court made this determination after close of discovery and with concrete evidence of the precise number of calls, the length of those calls, and the content discussed therein. *Id.* At this stage in litigation, it is premature to find that only "several" calls took place, despite Plaintiff's statement that "numerous" calls were made. Moreover, the Court must examine the substance of

23

those calls to determine whether Plaintiff was required to perform tasking beyond the scope of what is permissible while on FMLA leave. See *Antekeier*, 295 F. Supp. 3d at 686 ("An employer cannot ask an employee to do work while he or she is on FMLA leave, but an employer may contact an employee to update an employee on events in the office or to ask the employee when he or she plans to return to work.") Through additional discovery, the Court can evaluate the precise number of calls and the substance of those calls to better determine whether the alleged interference was in fact "*de minimus*." Accordingly, the Court finds that Plaintiff states sufficient facts to satisfy the second element of Count I.

Finally, concerning the third element, "[t]he FMLA provides no relief unless the employee has been prejudiced by the violation." *Vannoy v. Fed. Reserve Bank of Richmond*, 827 F.3d 296, 302 (4th Cir. 2016). Plaintiff argues that her "forced" participation in audit- and investigation-related phone calls "ultimately result[ed] in the termination of her position" and "interfered with Ms. Smith's federally protected rights." Am. Compl. ¶¶ 194, 195. These alleged harms, if true, could have very well been the result of Plaintiff having to participate in the audit while on FMLA leave. Therefore, element three is satisfied and Count I states a plausible claim.

Accordingly, Defendants' Motion to Dismiss Count I is **DENIED**.

### D. Count Two – Retaliation for Taking Family and Medical Leave

Plaintiff claims that Norfolk retaliated against her for taking FMLA leave. Am. Compl. ¶ 199. Alternatively, Plaintiff accuses Defendant Dr. Belton of retaliating against Plaintiff "for taking valid FMLA leave by concocting a scheme to have Plaintiff terminated for false charges of embezzlement." *Id*. at ¶ 200. Plaintiff's retaliation claims, however, are not sufficiently pled.

"To establish a prima facie retaliation claim under the FMLA, the plaintiff must demonstrate 'that [s]he engaged in protected activity, that the employer took adverse action against

24

h[er], and that the adverse action was causally connected to the plaintiff's protected activity.'"" *Waag v. Sotera Def. Solutions, Inc.*, 857 F.3d 179, 191 (4th Cir. May 16, 2017) (citing *Sharif v. United Airlines, Inc*., 841 F.3d 199, 203 (4th Cir. 2016)). While prongs one and two are satisfied in that Plaintiff engaged in the protected activity of taking FMLA leave and was ultimately terminated from employment[5], Plaintiff has failed to state facts demonstrating that these two events were causally connected.

A causal connection exists when "the employer takes adverse employment action against an employee shortly after learning of the protected activity." *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004), *abrogation on other grounds recognized by Foster v. Univ. of Maryland-Eastern Shore*, 787 F.3d 243, 249 (4th Cir. 2015). Plaintiff took FMLA leave from January 15, 2020 through March 9, 2020. After months of investigation and review, Plaintiff was ultimately terminated on September 16, 2021. Other courts have dismissed retaliation claims in which termination was too remote from the adverse employment action. See *Westbrooks v. Baltimore Cty*., 2019 U.S. Dist. LEXIS 140647 (D. Md. Aug. 20, 2019) (dismissed where Plaintiff was terminated two months after she exhausted her FMLA leave); *Oglesby v. Itron Electricity Metering, Inc*., 2018 U.S. Dist. LEXIS 137391 (D.S.C. June 26, 2018) (dismissed, in part, because nearly six months elapsed between termination and FMLA leave).

Moreover, Plaintiff's own pleadings indicate that the alleged conduct that led to Plaintiff's termination included accusations that Plaintiff embezzled school funds that resulted in a loss of approximately $1,567.00. Am. Compl. ¶ 130; ECF No. 19-7, at 3. It appears to the Court that

---

[5] Despite Plaintiff's assertions, the only adverse action applicable to Plaintiff is her termination, not the financial investigation or her having been placed on paid leave. In *Lacasse v. Didlake, Inc*., this Court found, and the Fourth Circuit agreed, that "[p]aid leave is not an adverse employment action," as paid leave does not impact an employee's job position or compensation. 194 F. Supp. 3d 494, 504 (E.D. Va. Jul. 7, 2016), subsequently aff'd, 712 F. App'x 231 (4th Cir. 2018).

Plaintiff's termination, which took place six months after the end of her FMLA leave, was based upon the results from the audit and financial investigation. The mere fact that those events began while Plaintiff was on FMLA leave does not mean that her FMLA leave was the cause of her termination. Moreover, the Amended Complaint even states that the audit specifically gave rise to her termination. *See* Am. Compl. ¶ 83 ("Ms. Brown, along with Dr. Belton, used th[e] audit in order to pin Ms. Smith as a scapegoat for any financial discrepancies and to have her eventually terminated"). Further, Plaintiff contends that her role as a scapegoat was the only basis for her termination. *Id.* at ¶ 203 ("Dr. Belton[] initiated an investigation into Ms. Smith while she was on FMLA leave for the *sole purpose* of having her terminated and blamed for their mismanagement." (emphasis added)). Accordingly, Plaintiff fails to establish a causal link between her FMLA leave and termination, warranting dismissal of Count II.

Therefore, Defendants' Motion to Dismiss Count II is **GRANTED**.

### E. Count Three – Defamation Per Se

To establish defamation, a plaintiff must plausibly show the defendant (1) published (2) an actionable statement with (3) the requisite intent. *Jordan v. Kollman*, 269 Va. 569, 575 (2005); *see also Fleming v. Moore*, 221 Va. 884, 889 (1981) (noting that Virginia defamation law does not distinguish between actions for libel and slander). An actionable statement must be "both false and defamatory." *Jordan*, 269 Va. at 575.

Specifically, as the Fourth Circuit noted, under Virginia law, the following kinds of statements are actionable as defamation *per se:*

(1) statements that "impute to a person the commission of some criminal offense involving moral turpitude, for which the party, if the charge is true, may be indicted and punished," (2) statements that "impute that a person is infected with some contagious disease, where if the charge is true, it would exclude the party from society," (3) statements that "impute to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of duties of

26

such an office or employment," and (4) statements that "prejudice such person in his or her profession or trade.

*Hatfill v. New York Times Co*., 416 F.3d 320, 330–31 (4th Cir. 2005) (quoting *Carwile v. Richmond Newspapers, Inc.,* 196 Va. 1 (1954)). Furthermore, "[t]he critical distinction between defamation per se and other actions for defamation is that a person so defamed is presumed to have suffered general damages, and any absence of actual injury is considered only in diminution of damages." *Stamathis v. Flying J, Inc*., 389 F.3d 429, 440 (4th Cir. 2004). Furthermore, while statements may be deemed to have a false factual connotation, this is not sufficient to support a defamation action. *See Katz v. Odin, Feldman & Pittleman, P.C*., 332 F. Supp. 2d 909 (E.D. Va. 2004) ("[T]he fact that some of the alleged statements may have been false, without more, is not sufficient to maintain a cause of action for defamation."). The statements must also be capable of having a defamatory meaning. *See Perry v. Isle of Wight Cty*., No. 2:15cv204, 2016 U.S. Dist. LEXIS 53362, 2016 WL 1601195, at *3 (E.D. Va. April 20, 2016). To be actionable, the statement must "tend[] to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him" in order to have a defamatory meaning. *Chapin v. Knight-Ridder, Inc*., 993 F.2d 1087, 1092 (4th Cir. 1993). In determining whether a statement has a defamatory meaning, the court considers the plain and natural meaning of the words in addition to the inferences fairly attributable to them. *Pendleton v. Newsome*, 290 Va. 162, 175 (2015); *see also, Wells v. Liddy*, 186 F.3d 505, 523 (4th Cir. 1999)). However, whether the plaintiff was defamed remains a question to be resolved by the factfinder. *Pendleton*, 290 Va. at 172.

Moreover, if the communication is on a topic which they share a common interest or duty, then the defendant has a qualified privilege which precludes liability for potentially defamatory statements. *Larimore v. Blaylock*, 259 Va. 568, 572 (2000); *see also, Dragulescu v. Virginia Union University*, 223 F. Supp. 3d 499, 508 (E.D. Va. 2016) (holding that a defamation claim can be

27

defeated by a finding of privilege, absolute or qualified). A plaintiff can defeat this privilege if she shows by clear and convincing evidence that the defendant made the statement with malice. *Mann v. Heckler & Koch Def., Inc.*, 639 F. Supp. 2d 619, 636 (E.D. Va. 2009), *aff'd*, 630 F.3d 338 (4th Cir. 2010). A non-exhaustive list of ways to prove malice in this context includes showing that (1) the defendant made the statement knowing it was false or with reckless disregard for the truth; (2) personal spite or ill will motivated the defendant to make the statement; (3) the statement included "strong or violent language disproportionate to the occasion;" or (4) the defendant did not make the statement in good faith. *Goulmamine v. CVS Pharmacy, Inc.*, 138 F. Supp. 3d 652, 665 (E.D. Va. 2015) (citing *Cashion v. Smith*, 286 Va. 327, 339, 749 S.E.2d 526, 533 (2013)). Notably, the factfinder must determine whether a qualified privilege applies to the defamatory statements. *See Choi v. Kyu Chul Lee*, 312 F. App'x 551, 554 (4th Cir. 2009) ("Locating the line separating constitutionally protected speech from actionable defamation can be difficult and requires consideration of the nature of the language used and the context and general tenor of the article to determine whether the statement can reasonably be viewed as an assertion of actual fact."). If "a reasonable factfinder could conclude that the statements ... imply an assertion [of fact]," the statements are not protected. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990). Additionally, "factual statements made to support or justify an opinion can form the basis of an action for defamation." *WJLA-TV v. Levin*, 264 Va. 140, 156–57 (2002) (citing *Williams v. Garraghty*, 249 Va. 224, 233 (1995)); *see also, Swengler v. ITT Corp.*, 993 F.2d 1063, 1071 (4th Cir. 1993). Whether an alleged defamatory statement is one of fact or of opinion is a question of law to be resolved by the trial court. *Chaves v. Johnson*, 230 Va. 112, 119 (1985).

Defendants allege that Plaintiff has not pled specifically the "exact language of the allegedly defamatory statements, to whom the statements were made, and when." Def.'s Mem.

Opp. 15. However, the Court finds that Plaintiff has pled sufficient facts that if proven true, state a plausible claim of defamation per se. Specifically, Plaintiff alleges that Dr. Belton specifically accused Plaintiff of embezzlement and mishandling receipts to the teachers and staff of Ghent. Am. Compl. ¶ 106. Then, beginning on March 9, 2020, Plaintiff alleges that Dr. Belton forced teachers and staff at Ghent Elementary School to fill out forms asserting that Ms. Smith had mishandled receipts and embezzled funds." *Id.* at ¶ 107. Notably, Plaintiff alleges that Dr. Belton drafted these forms herself and "bullied" certain subordinate teachers, and but not lead teachers, into signing them to agree that Plaintiff deliberately mishandled receipts and embezzled funds. *Id.* at ¶¶ 108-113.

Similarly, Plaintiff alleges that Mr. Billups defamed her by "accusing her of embezzlement." *Id.* at ¶ 215. Then, Dr. Belton, Ms. Felton, and Ms. Brown told "auditors, coworkers, and Mr. Billups between March 10, 2020 and June 29, 2020 that the Plaintiff had embezzled money from Ghent." *Id.* at ¶ 216. Moreover, Dr. Belton then accused Plaintiff of embezzlement to "teachers and staff at Ghent Elementary." *Id.* at ¶ 217. Furthermore, Plaintiff alleges that Mr. Billups published the following statement into the permanent personnel record of the Plaintiff for any NPS employee to view and also sent it to Mr. Hazelette and Dr. Byrdsong, along with the School Board: "Specifically, a preponderance of information supports that you perpetrated embezzlement of the school funds which resulted in a loss of approximately $1,567.00." *Id.* at ¶¶ 225-227. Mr. Billups also published the statement to the Norfolk School Board at the meeting on September 16, 2020. *Id.* at ¶ 229. Plaintiff also alleges that the statement was further published in a form which Dr. Belton allegedly "forced teachers and staff to fill out []confirming the false allegations of Plaintiff's embezzlement." *Id.* at ¶ 218. Therefore, the Court finds that Plaintiff has plead sufficient facts to satisfy elements one and two.

In this case, the Court finds that Plaintiff has pled sufficient facts to plausibly overcome any defense of qualified privilege to protect the communication. While a factfinder must determine whether Dr. Belton's and Mr. Billups' alleged defamatory statements were privileged, at this stage, Plaintiff has pled sufficient facts that, if proven true, could plausibly show that Defendants acted with malice and ill-will. Specifically, Plaintiff alleges that "Dr. Belton knew or should have known that her allegations against Plaintiff were false, as evidenced by her forced attempts to back up her defamation after the fact." Am. Compl. ¶ 220. Moreover, Plaintiff alleges that "Dr. Belton defamed Plaintiff in order to blame her for Dr. Belton's policies and mismanagement at Ghent Public School." *Id.* at ¶ 222. In all, Plaintiff alleges that Dr. Belton acted with malice and ill will toward Plaintiff. *Id.* at ¶ 225. In support of this assertion, Plaintiff states that, for example, although there was an audit and investigation, Plaintiff was "never interviewed about the alleged practices...." *Id.* at ¶ 88. Moreover, when Plaintiff returned from her FMLA leave, "Dr. Belton confronted Ms. Smith in front of her coworkers and instructed her to leave the premises." *Id.* at ¶ 93. In all, "Dr. Belton, NPS, and Mr. Billups treated Ms. Smith like a criminal" and was banned from returning to the school, retrieving her personal property, and picking up her relatives from NPS before there was any final determination about the allegation against her or before she was allowed to respond to them. *Id.* at ¶ 101.

Similarly, Plaintiff alleges that Mr. Billups was also "aware that the accusations were false or acted in wanton and reckless disregard for the veracity of the statements." *Id.* at ¶ 230. Moreover, Mr. Billups "did not verify whether the accusations made against the Plaintiff were true or false." *Id.* at ¶ 231. Plaintiff alleges, "in fact no evidence has been submitted at all which ties Mrs. Smith to any missing funds." *Id.* Accordingly, the Court finds that Plaintiff has pled sufficient facts, that if proven true, establish that Dr. Belton and Mr. Billups acted with malice, which is

"behavior actuated by motives of personal spite, or ill-will, independent of the occasion on which the communication was made." *Smalls v. Wright,* 241 Va. 52, 55 (1991); *Crawford & Co. v. Graves,* 199 Va. 495, 499 (1957). Although Plaintiff's conclusory statements that Dr. Belton and Mr. Billups acted with malice, on their own, are not, by themselves, sufficient to state a claim of malice sufficient to overcome the qualified privilege," *see Young v. City of Mount Rainier,* 238 F.3d 567, 577 (4th Cir. 2001), Plaintiff also asserted numerous facts that support that Dr. Belton and Mr. Billups publicly accused Plaintiff of criminal acts (i.e. mishandling receipts and embezzlement) to her colleagues, school board, and public without confirming their truthfulness and without providing Plaintiff with an opportunity to respond.

Therefore, the Defendants' Motion to Dismiss Count III is **DENIED**.

## F. Count Four – Violation of 42 U.S.C. Section 1983

Pursuant to 42 U.S.C. § 1983[6], a plaintiff must establish that the (1) defendants violated a right secured by the Constitution or laws of the United States and (2) acted under color of state law in so doing. *See American Mfr. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50–52 (1999); *see also, New Burnham Prairie Homes v. Village of Burnham*, 910 F.2d 1474, 1479 (7th Cir.1990) (citing, *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), overturned on other grounds); *see also, Carter v. City of Philadelphia*, 989 F.2d 117, 119 (3d Cir. 1993) (quotation omitted) (to

---

[6] 42 U.S.C.A. § 1983 provides in full:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

establish a section 1983 civil rights claim, a plaintiff "must demonstrate that the conduct complained of was committed by a person acting under state law and 'that the conduct deprived him of rights, privileges or immunities secured by the Constitution'"). If either of these elements is missing, the complaint fails to state a claim for relief under § 1983. Here, Plaintiff argues she had (1) a property interest in her continued employment with Ghent School, entitling her to Fourteenth Amendment due process protections; (2) a right to counsel, entitling her to Sixth Amendment protections; and (3) a right against self-incrimination, entitling her to Fifth Amendment Protections. Am. Compl. ¶¶ 245-56.

### 1. Deprivation of Property Interest in Employment

To satisfy the first prong of a § 1983 claim, Plaintiff, in the case at bar, first relies on her constitutional right to due process under the Fourteenth Amendment. The due process clause of the Fourteenth Amendment provides that "no state shall deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. In order to establish a due process violation, "a plaintiff must first show that he has a constitutionally protected 'liberty' or 'property' interest, and that he has been 'deprived' of that protected interest by some form of 'state action.'" S*tone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 172 (4th Cir. 1988) (citing *Bd. of Regents v. Roth*, 408 U.S. 564 (1972) and *Daniels v. Williams*, 474 U.S. 327 (1986)) (internal citations omitted). If the plaintiff makes such a showing, the court considers what process was required and whether any provided was adequate in the particular factual context. *Id.*

In the employment context, "it is not enough for a plaintiff to demonstrate that he has lost his job." *Herman v. Lackey*, 309 F. App'x 778, 783 (4th Cir. 2009). "The relevant inquiry is whether the plaintiff possessed a protectable property interest in his or her continued employment." *Id.* "To have a property interest in a benefit, a person clearly must have more than an abstract need

32

or desire for it…[and] more than a unilateral expectation of it." *Roth*, 408 U.S. at 579. Instead, "he must have a legitimate claim of entitlement to it" for due process requirements to attach. *Id.*; *see also Royster v. Bd. of Trustees*, 774 F.2d 618, 621 (4th Cir. 1985).

Property interests are not established by the Constitution. Rather, they "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Roth*, 408 U.S. at 577; *see also Knight v. Vernon*, 214 F.3d 544, 553 (4th Cir. 2000). "In the context of employment in public education, the independent source for the property interest has been said to be a contract which provides for continued employment, and which can be terminated only for good cause." *Royster*, 774 F.2d at 620-21 (citing *Wooten v. Clifton Forge School Bd.*, 655 F.2d 552, 554 (4th Cir. 1981)); *see also Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982) ("The hallmark of property, the Court has emphasized, is an individual entitlement grounded in state law, which cannot be removed except 'for cause.'"). An employee who is terminable at will under state law "has no legitimate expectancy of continued employment and thus has no protectible property interest." *Jenkins v. Weatherholtz*, 909 F.2d 105, 107 (4th Cir. 1990) (discussing the at-will employment of a local government employee) (citing *Bishop v. Wood*, 426 U.S. 341, 345 & n. 8 (1976)).

In Virginia, an employment relationship is presumed to be at-will. *County of Giles v. Wines*, 262 Va. 68, 72 (2001). This presumption may be rebutted "if sufficient evidence is produced to show that the employment is for a definite, rather than an indefinite, term." *Id.* (citing *Progress Printing Co. v. Nichols*, 244 Va. 337, 340 (1992)). For instance, a contractual agreement stating that an employee "will not be disciplined or dismissed from employment without a just cause" creates a definite term for the duration of employment. *Id.* at 72-73 (quoting *Norfolk S. Ry. Co. v. Harris*, 190 Va. 966, 976 (1950) (internal quotations omitted). Here, Plaintiff relies on two

33

sources to demonstrate her property interest in continued employment with Ghent School: (1) her contract with NPS; and (2) the NPS termination procedures, which were purportedly executed under Virginia Code § 22.1-308. Am. Compl. ¶¶ 246-48.

First, it is undisputed that Plaintiff had a written contract for employment during the 2019-2020 school year. *See* Am. Compl., Ex. A. The contract explicitly states that the "employee shall be in a probationary (employment at will) status for the first fifteen (15) weeks of employment if hired from outside the school system or if given a new job within the school system." *Id.* During said probationary period, "the employee shall have no right to the administrative review procedures set forth in policies and regulations of the Norfolk Public Schools." *Id.* Plaintiff contends that she was an at-will employee for the first fifteen weeks of her employment, after which her employment "converted" "to one in which she had a vested interest and for which she could only be terminated for cause." Pl.'s Mem. Opp. 20. Defendants, on the other hand, argue that Plaintiff was not subject to the probationary period at all for the 2019-2020 school year because she was not hired from outside the school system or given a new job within the school system. Def.'s Reply 11. Rather, the parties agree that Plaintiff has worked at the school since October 2000. *Id.*; Am. Compl. ¶ 12. Defendants argue that, "if Plaintiff's argument is accepted, then every year, for the past 20 years, Ms. Smith would be in a probationary, at-will period for the first 15 weeks and then her contract would convert to another type of employment." Def.'s Reply 11. Instead, Defendants conclude that "[a]t all times during the 2019-2020 school year, Ms. Smith was an at-will employee." *Id.*

The Court finds that, according to the evidence presented, Plaintiff was never subject to the probationary period and was an at-will employee during the entire 2019-2020 school year. Although Plaintiff had a definite period of employment, the 2019-2020 school year, her contract

34

could not *only* be terminated for cause. Rather, her contract explicitly states that she "*may* be dismissed for cause." Am. Compl., Ex. A (emphasis added). Indeed, to rebut the at-will presumption, "an employer must make an unequivocal statement that it will discharge employees *only* for just cause." *Grant v. Southside Reg'l Jail*, No. 3:19-CV-70, 2019 WL 4858317, at *4 (E.D. Va. Oct. 2, 2019) (citing *Wines*, 262 Va. At 72-72) (emphasis added). Here, Plaintiff could have been dismissed with or without cause, so she fails to rebut the at-will presumption.

Second, Plaintiff points to the termination procedures as further evidence to rebut the presumption of at-will employment. However, a grievance procedure itself does not create a property interest, nor does it rebut the at-will presumption. *Grant*, 2019 WL 4858317, at *4 (citing *Davis v. Rao*, 982 F. Supp. 2d 683, 689 (E.D. Va. 2013), *aff'd*, 583 F. App'x 113 (4th Cir. 2014) ("The Fourth Circuit has ... indicated that at-will employees have no protectable property interest in procedure itself.")). Moreover, the grievance procedures Plaintiff cites, even when viewing them as incorporated into her contract, still do not rebut the at-will presumption.

The Norfolk City School Board Policies and Regulations ("School Board Policies"), Section GDPD-R applies "to all classified personnel." Am. Compl. Ex. B, at 1. The Administrative Procedures listed in this Section outline the discipline and dismissal procedures for "probationary" and "permanent" employees. *Id.* at 1-2. According to the School Board Policies, "probationary employees" are "[a]ll employees newly hired, transferred to a different position, rehired after termination of their seniority, or promoted to a new position" and are considered as such "until the completion of not less than fifteen (15) weeks of actual work." *Id.* at 2. Discharge during this probationary period "shall not be subject to the grievance procedure." *Id.* "Permanent employees," on the other hand, "*may* be discharged by the superintendent for any behavior, conduct, or cause described in these rules provided, however, that prior to such action, the employee sought to be

discharged shall be entitled to a review of the reasons for such action." *Id.* (emphasis added). The employee sought to be discharged must make a request for review to the senior director of human resources "within seven (7) working days from the time the employee received notification (verbal or written) of the intent to suspend or discharge." *Id.* No later than "seven (7) working days" thereafter, the superintendent or his authorized representative must conduct the review requested by the employee. *Id.*

Assuming, without concluding, that Plaintiff is a "permanent" employee, she would still be an at-will employee because, according to the Norfolk Policies, even permanent employees *may*, not must, be discharged for cause. The fact that permanent employees are entitled to a grievance procedure still does not convert their employment from at-will. Rather, without an unequivocal statement by NPS that permanent employees can only be dismissed for cause, they cannot rebut the at-will presumption. *Grant*, 2019 WL 4858317, at *4. Therefore, regardless of whether Plaintiff was a probationary or a permanent employee, she was still an at-will employee that was not required to be discharged for cause. Accordingly, Plaintiff does not have a legitimate expectation of continued employment and therefore has no protectible property interest such that due process rights attach. *Weatherholtz*, 909 F.2d at 107. Without a protectible property interest at stake, the Court need not assess the state law action prong. *Sullivan*, 526 U.S. at 50–52.

### 2. Right to Counsel and Right Against Self-Incrimination

Plaintiff also asserts claims under § 1983 that Defendants violated her Sixth Amendment right to counsel and her Fifth Amendment right against self-incrimination. Am. Compl. ¶¶ 245-56. Defendants argue that Plaintiff abandoned these claims in her response to the instant Motion and they should therefore be dismissed. Def.'s Reply 14-15. In her response, Plaintiff appears to limit her claims under Count IV to the due process basis and abandon the right to counsel and right

36

against self-incrimination bases. *See* Pl.'s Mem. Opp. 19-21. She titles the discussion for this count as "Count IV: 1983 Due Process." *Id.* at 19. However, Plaintiff does assert that "Defendant terminated Plaintiff without allowing her representation of counsel at a review at which Plaintiff could incriminate herself." *Id.* This brief response to Defendants' arguments could be insufficient enough to warrant the Court deeming Defendants' arguments conceded. *See Burke*, 2019 WL 459022, at *5; *Chamblee*, 2014 WL 1415095, at *8. Even if the response were sufficient, the Court would still find that Plaintiff's Fifth and Sixth Amendment claims fail.

Specifically, the Fifth Amendment provides that no one "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Sixth Amendment, provides that "[i]n all criminal prosecutions, the accused shall enjoy the right…to have the assistance of counsel for his defense." U.S. Const. amend. VI. Both amendments are "expressly limited to criminal cases." *Austin v. United States*, 509 U.S. 602, 607 (1993). Indeed, the "privilege against self-incrimination guaranteed by the Fifth Amendment is a fundamental trial right of criminal defendants." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 264 (1990) (citing *Malloy v. Hogan*, 378 U.S. 1, 84 (1964)). Regardless of any conduct taken by law enforcement officials prior to trial that may impair that right, "a [Fifth Amendment] constitutional violation occurs only at trial." *Id.* (citing *Kastigar v. United States*, 406 U.S. 441, 453 (1972)). Further, "[t]he protections provided by the Sixth Amendment are explicitly confined to 'criminal proceedings.'" *Austin*, 509 U.S. at 608. Thus, even taking as true for purposes of this Motion that the City Attorney told Plaintiff that her testimony at the review would be turned over to the Commonwealth Attorney's Office for potential prosecution, Plaintiff's right against self-incrimination would not be implicated unless and until she faces trial for criminal charges. Am. Compl. ¶ 142. Similarly,

regardless of whether Plaintiff was entitled to counsel according to Norfolk Policies, her Sixth Amendment right would not attach unless and until she faces criminal prosecution.

Therefore, Defendants' Motion to Dismiss Count IV is **GRANTED**.

**G. Count Five – Wrongful Termination in Contravention of Public Policy**

In the alternative to Count IV, Plaintiff alleges that the School Board[7] wrongfully terminated her in contravention of Virginia public policy. Am. Compl. ¶ 258. Specifically, Plaintiff contends that the School Board violated Virginia Code § 22.1-308, which governs the grievance and discharge procedures for public school employees, by refusing Plaintiff the opportunities to be represented by counsel and to present witnesses during her dismissal review hearing. *Id.* at ¶¶ 259, 262. Thus, in "failing to fulfill its grievance procedure obligations under Virginia law" and subsequently terminating her, Plaintiff alleges that the School Board wrongfully terminated her in violation of public policy. *Id.* at ¶¶ 265-66.

As previously stated, employment relationships in Virginia are presumed to be at-will. *County of Giles*, 262 Va. at 72. However, Virginia recognizes exceptions to the "rule of terminability" for "at-will employees who claim to have been discharged in violation of an established public policy." *Bowman v. State Bank of Keysville*, 229 Va. 534, 539 (1985). The court in *Bowman* lists several examples of such public policy violations, including firing at-will employees who asked their employers to follow the law or firing them for refusing to violate it. *Id.* at 539-40 (citing *Sheets v. Teddy's Frosted Foods, Inc.*, 179 Conn. 471 (1980) (at-will employee fired in retaliation for his insistence that his employer comply with state laws relating to food labeling); *Nees v. Hocks*, 272 Or. 210 (1979) (employee fired for refusing employer's request to ask for excuse from jury duty); *Sabine Pilot Service, Inc. v. Hauck*, 687 S.W.2d 733 (Tex. 1985)

---

[7] Plaintiff also names Dr. Byrdsong in her official capacity in this Count. As discussed *supra*, that claim is duplicative of the one against the School Board and is therefore dismissed.

38

(employee discharged for refusal to perform an illegal act); and *Harless v. First National Bank in Fairmont*, 162 W.Va. 116 (1978) (bank employee discharged in retaliation for his efforts to require employer to comply with state and federal consumer credit protection laws)).

Similarly, the defendants in *Bowman* discharged plaintiffs, who were at-will employees and stockholders, in retaliation for exercising their statutory right to vote on a corporate matter submitted to a vote at a meeting of stockholders. *Id.* at 540. The court found that the relevant statute "contemplates that the right to vote shall be exercised free of duress and intimidation imposed on individual stockholders by corporate management." *Id.* In order for the goal of the statute and the public policy to be fulfilled, the court asserted that "the shareholder must be able to exercise this right without fear of reprisal from corporate management which happens also to be the employer." *Id.* Ultimately, the court held that "[b]ecause the right conferred by statute is in furtherance of established public policy, the employer may not lawfully use the threat of discharge of an at-will employee as a device to control" the employee's exercise of that right. *Id.* In other words, employers may not threaten to or discharge at-will employees for exercising their statutory rights.

The court in *Bowman* also emphasized that a violation of established public policy is a "narrow exception to the employment-at-will rule." *Id.* Since then, the Supreme Court of Virginia has consistently characterized public policy exceptions as such. *See Francis v. Nat'l Accrediting Comm'n of Career Arts & Scis., Inc.*, 293 Va. 167, 172 (2017) (citing *Lawrence Chrysler Plymouth Corp. v. Brooks,* 251 Va. 94, 97-98 (1996); *Lockhart v. Commonwealth Educ. Sys. Corp.*, 247 Va. 98, 104 (1994); *Bowman*, 229 Va. at 540). The court repeatedly notes that "[w]hile virtually every statute expresses a public policy of some sort, we continue ... to hold that termination of an employee in violation of the policy underlying any one statute does not automatically give rise to

39

a common law cause of action for wrongful discharge." *Id.* (citing *Rowan v. Tractor Supply Co.*, 263 Va. 209 (2002); *City of Virginia Beach v. Harris*, 259 Va. 220, 232 (2000)).

Indeed, the Supreme Court of Virginia has only concluded that a claim was sufficient to constitute a common law cause of action for wrongful termination of an at-will employee under the *Bowman* public policy exception in three circumstances or "scenarios." *Id.* at 172-73 (citing *Rowan*, 263 Va. at 213-14). Specifically, the three relevant scenarios are (1) when "an employer violated a policy enabling the exercise of an employee's statutorily created right" (*See Bowman*, 229 Va. at 540); (2) when "the public policy violated by the employer was explicitly expressed in the statute and the employee was clearly a member of that class of persons directly entitled to the protection enunciated by the public policy" (*See Bailey v. Scott-Gallaher, Inc.*, 253 Va. 121 (1997); *Lockhart*, 247 Va. at 98); and (3) when "the discharge was based on the employee's refusal to engage in a criminal act" (*See Mitchem v. Counts*, 259 Va. 179, 190 (2000)). *Id.*

Plaintiff alleges that her claim falls within the first scenario because, "as a full-time employee," she was "entitled to representation by counsel during grievance procedures" pursuant to Virginia Code. § 22.1-308(4). Pl.'s Mem. Opp. 24. When "Defendants expressly denied Ms. Smith the right to bring her counsel to her review," Plaintiff alleges that they violated her "statutorily created right" and "[a]s a result of this violation, Ms. Smith was terminated." *Id.* However, to successfully state a claim for wrongful discharge under this scenario, Plaintiff must show that the School Board's decision to terminate her violated public policy. *Francis*, 293 Va. at 173 (citing *Rowan*, 263 Va. at 213-14). When analyzing this claim, the Court must "discern what right was conferred on an employee by statute, and then whether the employer's termination of employment violated the public policy underlying that right." *Id.* Specifically, "a viable *Bowman* claim in this context … require[s] a showing that the termination of employment *itself* violated the

40

stated public policy." *Id.* (emphasis in original). A discharge, under a public policy exception, is tortious "not because the employee[] ha[s] a vested right to continued employment, but because the employer ... misuse[s] its freedom to terminate the services of at-will employees in order to subvert a right guaranteed ... by statute." *Miller v. SEVAMP, Inc.*, 234 Va. 462, 467 (1987).

Here, the parties diverge on whether the statute confers any right on Plaintiff at all. Defendants argue that Virginia Code § 22.1-308 "is the state statutory grievance procedure for teachers, which Ms. Smith is unquestionably not." Def.'s Mem. Supp. 23. Even if the statute did apply to her, however, Defendants further argue that it "cannot form the basis of a *Bowman* claim because the statutory grievance procedure provides a statutory remedy for enforcing that policy." *Id.* Plaintiff concedes that the statute explicitly refers to "teachers," but argues that the Court should ignore the plain meaning of the word since the statute does not provide its own definition, and instead follow the Virginia Administrative Code's definition, which defines a teacher as "[a]ll employees of the school division involved in classroom instruction and all other full-time employees of the school division except those employees classified as supervising employees." Pl.'s Mem. Opp. 22-23 (citing 8VAC20-90-10). Specifically, Plaintiff asserts that this definition of teacher should apply and, accordingly, § 22.1-308 includes her as such because she qualifies under the category of "all other full-time employees." *Id.* While the Court ultimately finds that § 22.1-308 applies to her, it also finds that the statute does not apply to her dismissal.

Defendants claim in the instant Motion and their reply that § 22.1-308 does not apply to Plaintiff because she is not a teacher. *See* Def.'s Mem. Supp. 23; Def.'s Reply 15. Yet, they proceed to contradict themselves by citing to § 22.1-79(6), regarding the general powers and duties of school boards, which states, in relevant part: "Except in the case of dismissal, suspension, or other disciplinary action, the grievance procedure prescribed by the Board of Education pursuant to §

22.1-308 shall apply to all full-time employees of a school board, except supervisory employees." Def.'s Reply 15-16. Therefore, regardless of the applicability of the Administrative Code regulations to which Plaintiff cites, § 22.1-308 explicitly applies to Plaintiff as a "full-time employee[] of a school board." Nonetheless, Defendants prevail in their argument for two reasons: (1) Defendants claim that it is exempt entirely from following the grievance procedure prescribed by the Board of Education pursuant to § 22.1-308; and (2) even if § 22.1-308 applied to the Norfolk School Board, and therefore to Plaintiff, it would not apply to Plaintiff's dismissal.

First, Defendants assert that § 22.1-79(6) only mandates that a school board implement a grievance procedure pursuant to the Virginia Code "[i]n instances in which no grievance procedure has been adopted prior to January 1, 1991." Defendants state that "the School Board Policy GDPD-R at Exhibit B was adopted in 1980," and, since "the School Board was already in compliance with the mandate to establish a grievance procedure," it "is permitted to operate and has been operating under its established procedures for classified employees since 1980." Def.'s Reply 16. Therefore, since the School Board's policy predates the mandate under § 22.1-79(6), and consequently renders that mandate inapplicable to Defendants, then § 22.1-308 does not apply to Defendants at all. Second, however, even if the mandate applies to Defendants, § 22.1-79(6) explicitly excludes § 22.1-308's application to cases of "dismissal, suspension, or other disciplinary action" for full-time employees. Thus, even if § 22.1-308 applies to Plaintiff, it would not apply to her dismissal. Since Plaintiff is challenging the grievance procedure as applied to her dismissal, her claim fails.

In sum, the court in *Bowman* concluded that the public policy the employer violated existed to protect the exercise of plaintiff's statutory right. 229 Va. at 540. However, as applied to Plaintiff, "there is no statutory right, and therefore, there exists no corresponding public policy necessary to

protect the right." *Rowan*, 263 Va. at 215. Accordingly, Virginia Code § 22.1-308, as applied to Plaintiff as a non-teacher employee, "does not create a statutory right or a corresponding public policy of the type that would support an exception to the employment-at-will doctrine and thus allow a common law action for wrongful termination." *Id.*

Therefore, Defendants' Motion to Dismiss Count V is **GRANTED**.

## H. Count Six – Breach of Contract

To succeed on a breach of contract claim at trial, Plaintiff must establish the following elements: (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation. *Sunrise Continuing Care, LLC v. Wright*, 277 Va. 148, 154 (2009); *Filak v. George*, 267 Va. 612, 619 (2004). The parties stipulate that there was a legally enforceable obligation, or contract, between Plaintiff and the Norfolk School Board. *See* Def.'s Mem. Supp. 27 (referring to Am. Compl., Ex. A); Def.'s Reply 18 (same). However, the parties diverge on the specific nature of that obligation and, therefore, whether it was breached.

Plaintiff alleges that the "City of Norfolk Public Schools" – presumably the Norfolk School Board – "breached their contract with Ms. Smith by refusing to permit her to participate in the review hearing with her attorneys." Am. Compl. ¶ 268. Specifically, Plaintiff asserts that her contract with the School Board "incorporated [the] Norfolk School Board Policy (Exhibit B) and Va. Code § 22.1-308." *Id.* at ¶ 270. "These procedures," Plaintiff argues, "constitute an incorporated section of the contract between Norfolk Public Schools and its employees that modifies the at-will relationship between the parties." *Id.* at ¶ 273. Plaintiff claims that Defendants violated § 22.1-308 "by not permitting Plaintiff to be represented by counsel at the review hearing," and violated the School Board Policy "by not giving [her] effective notice of her removal

hearing before [the] Norfolk School Board."[8] *Id.* at ¶¶ 275, 277. In violating and failing to follow these procedures, which Plaintiff asserts are incorporated into her contract, Defendants allegedly breached their contract with Plaintiff. *Id.* at ¶ 279.

As a preliminary matter and as previously discussed in the analysis for Count V, § 22.1-308 does not apply to Plaintiff's dismissal because the statute does not apply to Norfolk Public Schools under § 22.1-79(6) and, even if it did, Plaintiff's dismissal is explicitly precluded from the rights guaranteed by that provision under § 22.1-79(6). Therefore, even if the Court were to assume that the statute is incorporated into her contract, Defendants were not obligated to follow it because it does not apply to dismissal actions. Further, as previously discussed in the analysis for Count IV, the School Board policies that Plaintiff cites, even when viewing them as incorporated into her contract, still do not rebut the at-will presumption to modify the at-will relationship between the parties. However, Defendants do concede that School Board Policy GDPD-R, the specific policy to which Plaintiff cites (Am. Compl. ¶ 270), is incorporated into Plaintiff's contract. *See* Def.'s Reply 18 ("[Plaintiff's] Employment Contract only provides for a review following a dismissal, that is in accordance with applicable policies, which in this case is School Board Policy GDPD-R."). The only remaining issue, therefore, is whether Defendants violated or breached the legal obligations created unto them by Policy GDPD-R. *Sunrise*, 277 Va. at 154; *Filak*, 267 Va. at 619.

Both parties point to paragraph six in Plaintiff's contract, which states:

> "The employee may be dismissed for cause. Should the employee file a written request for a review with seven (7) working days after notification of the proposed dismissal is given, a review shall be

---

[8] In Plaintiff's opposition paper, she appears to argue that her contract incorporated all regulations of the Commonwealth of Virginia. Pl.'s Mem. Opp. 28 ("As the regulations of the Commonwealth of Virginia are provisions of the employment contract between Plaintiff and Defendant, Defendants' failure to abide by those regulations constitutes a breach of the employment contract."). Plaintiff does not plead this in her Amended Complaint and, as Defendants point out, Plaintiff's contract does not incorporate every single regulation of the Commonwealth of Virginia. *See* Def.'s Reply 17-18. Therefore, the Court looks only to the policy Plaintiff cites to in her Amended Complaint, which is School Board Policy GDPD-R. Am. Compl. ¶ 270 (citing Ex. B).

> granted. *The procedures for such review shall be in accordance with applicable policies and regulations in effect at the time of review*."

Am. Compl. Ex. A (emphasis added). Plaintiff, in her Amended Complaint, asserts that the School Board violated Policy GDPD-R. *Id.* at ¶ 270 (citing Ex. B.). In her opposition paper, however, Plaintiff understands the last sentence of this paragraph to mean that all regulations of the Commonwealth of Virginia are incorporated into her contract. Pl.'s Mem. Opp. 28 ("As the regulations of the Commonwealth of Virginia are provisions of the employment contract between Plaintiff and Defendant, Defendants' failure to abide by those regulations constitutes a breach of the employment contract."). However, as Plaintiff herself points out, "[i]ncorporation by reference is proper where the underlying contract makes clear reference to a separate document, the identity of the separate document may be ascertained, and incorporation of the document will not result in surprise or hardship."[9] *Standard Bent Glass Corp. v. Glassrobots Oy*, 333 F.3d 440, 447 (3d Cir. 2003). There is no reference to any Virginia regulation in Plaintiff's contract. *See* Am. Compl., Ex. A. Therefore, the Court looks only to the policy Plaintiff cites to in her Amended Complaint, and that which Defendants agree applies, which is School Board Policy GDPD-R. Am. Compl. ¶ 270 (citing Ex. B); *see also* Def.'s Reply 18.

Norfolk School Board Policy GDPD-R applies "to all classified personnel." Am. Compl. Ex. B, at 1. The Administrative Procedures listed in this Section outline the discipline and dismissal procedures for "probationary" and "permanent" employees. *Id.* at 1-2. The purpose of these procedures is "to provide classified employees of Norfolk Public Schools fair opportunity to: (1) change behavior or attitude considered by superiors to be cause for discipline, or (2) to

---

[9] The Court notes that Plaintiff includes this quote in her opposition paper and cites to *Hertz Corp v. Zurich American Ins. Co.*, 496 F.Supp.2d 668, 675 (E.D. Va. 2007). Pl.'s Mem. Opp. 25. Plaintiff mistakenly attributes this quote to the court in *Hertz* and cites the wrong internal citation. *Id.* (attributing the court in *Hertz* as citing *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1201 (2d Cir. 1996). This quote was cited by the court in *Hertz* as an internal citation from *Standard Bent Glass Corp. v. Glassrobots Oy*, 333 F.3d 440, 447 (3d Cir. 2003).

challenge the superior's decisions regarding discipline." *Id.* One administrative consideration for these procedures is that the "employee must know in a timely manner when disciplinary action is being taken." *Id.*

According to the Administrative Procedures, "probationary employees" are "[a]ll employees newly hired, transferred to a different position, rehired after termination of their seniority, or promoted to a new position" and are considered as such "until the completion of not less than fifteen (15) weeks of actual work." *Id.* at 2. Discharge during this probationary period "shall not be subject to the grievance procedure." *Id.* "Permanent employees," including Plaintiff, "may be discharged by the superintendent for any behavior, conduct, or cause described in these rules." *Id.* The grievance procedure incorporated into Plaintiff's contract and to which she was entitled operates as follows: "prior to such [discharge] action, the employee sought to be discharged shall be entitled to a review of the reasons for such action." *Id.* The employee sought to be discharged must make a request for review to the senior director of human resources "within seven (7) working days from the time the employee received notification (verbal or written) of the intent to suspend or discharge." *Id.* No later than "seven (7) working days" thereafter, the superintendent or his authorized representative must conduct the review requested by the employee. *Id.*

Defendants complied with the grievance procedure set out in School Board Policy GDPD-R. On March 9, 2020, the day she returned from FMLA leave, Plaintiff received notice that she was being place on paid administrative leave pending the outcome of an "official internal investigation of a financial matter" that occurred at Ghent School. Am. Compl. Ex. F. On June 29, 2020, Plaintiff received notice that the internal investigation had concluded and her termination would be recommended to the Superintendent as a result of findings that she "perpetrated

embezzlement of []school funds which resulted in a loss of approximately $1,567.00," in violation of School Board Policy GAZ-Employee Conduct. *Id.* at Ex. G, 1, 3. The notice informed Plaintiff that she was "entitled to a meeting to discuss the recommendation of dismissal through a review process." *Id.* at Ex. G, 4. To exercise this right, Plaintiff had to request a review within seven business days of receipt of the letter, which was on or before July 9, 2020. *Id.*

On August 4, 2020, Mr. Billups sent Plaintiff a letter indicating that he had received, through her attorney, a request to review her recommended dismissal and a response to the recommendation notice letter. *Id.* at Ex. H. Mr. Billups also noted that the written document Plaintiff's attorney submitted on her behalf was received and acknowledged. *Id.* Mr. Billups notified Plaintiff that her "attorney's advocacy via the written document [would] be considered as part of the record in the review." *Id.* However, Mr. Billups noted that her attorney's advocacy would "not alter the procedure to which [she was] entitled as a classified employee, as this is not a hearing." *Id.* Therefore, Mr. Billups advised Plaintiff that "further participation by [her] attorney [would] not be allowed in the review." *Id.* Instead, Plaintiff would "have the opportunity to speak for [herself] during the review of the reasons for [her] proposed dismissal." *Id.* Finally, Mr. Billups informed Plaintiff that the review meeting was scheduled for Tuesday, August 11, 2020. *Id.* Mr. Steve Jenkins, the Chief Financial Officer, was noted as the "Superintendent's designee" and would therefore conduct the review. *Id.* Plaintiff was asked to confirm her attendance at the meeting through email notification to Mr. Billups. *Id.*

On August 31, 2020, Plaintiff received a letter from Mr. Jenkins notifying her that he had completed his review and concluded there were "adequate grounds for dismissal" of Plaintiff's employment. *Id.* at Ex. I. In the letter, Mr. Jenkins noted that, in a communication dated August 10, 2020, Plaintiff's attorney informed Mr. Billups that "the written documentation that had been

47

submitted on [Plaintiff's] behalf refuting the allegations should become part of the record, [] that [Plaintiff] had no further statements to add," and Plaintiff "would not attend the previously scheduled review meeting" on August 11, 2020. *Id.* Mr. Jenkins then informed Plaintiff that he had reviewed the report Ms. Felton and Ms. Beverly Allgood prepared, and Plaintiff's attorney's responses. *Id.* Mr. Jenkins listed six findings from his investigation and concluded that Plaintiff's dismissal was warranted. *Id.* On September 15, 2020 at 6:00p.m., Dr. Byrdsong informed Plaintiff that her termination would be decided at a School Board meeting the next day, on September 16, 2020. *Id.* at ¶¶ 150, 152.

Plaintiff alleges that the School Board breached their contract with her when she was not allowed to have her attorney present for the review hearings and because Dr. Byrdsong gave her insufficient notice of the meeting conducted on September 16, 2020. *Id.* at ¶¶ 268-79. However, the grievance procedures in Policy GDPD-R only provide Plaintiff with entitlements until the end of the review conducted by the superintendent or her designated representative. *See id.* at Ex. B, 2. After that point, the Policy does not provide any other information or entitlements to the employee. *Id.* Rather, it only elaborates on situations in which the superintendent "denies request for discharge" or "declines to discharge an employee." *Id.* Therefore, not only was Plaintiff not entitled to have an attorney present at her review hearing, but she was also not entitled to notice of or attendance at any subsequent meetings or hearings regarding her discharge. Thus, since the School Board complied with the grievance procedure to which Plaintiff was entitled under School Board Policy GDPD-R, which was incorporated into Plaintiff's contract, it did not breach its contract with Plaintiff.

Therefore, Defendants' Motion to Dismiss Count VI is **GRANTED**.

## I. Damages

Defendants move to dismiss Plaintiff's claims for declaratory relief under the FMLA (Counts I and II) and 42 U.S.C. § 1983 (Count IV), and her claim for punitive damages under Count III and IV. Def.'s Mem. Supp. 28-29 (citing Am. Compl., 31 at ¶¶ 1, 4-5). Since Counts II and IV have been dismissed, Plaintiff is not entitled to declaratory relief under Count II nor punitive damages under Count IV. The remaining issues pertain to Plaintiff's request for declaratory relief pursuant to the FMLA (Count I) and her request for punitive damages for defamation (Count III).

Defendants argue, first, that "[b]ecause Plaintiff complains of past actions, declaratory relief is unavailable to her." Def.'s Mem. Supp. 29. In support, Defendants emphasize that declaratory relief is a forward-facing remedy "designed to declare rights so that parties can conform their conduct to avoid future litigation, and are untimely if the questionable conduct has already occurred or damages have already accrued." *Id.* at 28 (quoting *Tapia v. U.S. Bank, N.A.*, 718 F.Supp.2d 689, 695 (E.D. Va. 2010)) (internal quotes and citations omitted). Here, Plaintiff asks the Court to award declaratory relief "declaring the acts and practices of Defendants to *have been* in violation of Ms. Smith's rights as secured by … the [FMLA]." Am. Compl. 31, at ¶ 1 (emphasis added). Since Plaintiff requests declaratory relief for past conduct, it is untimely.

Defendants next argue that her claim for punitive damages against the School Board[10] should be dismissed because "[i]t is well established that school boards and other municipal entities" are exempt from punitive damages. Def.'s Mem. Supp. 29. However, Plaintiff only alleges her defamation claim against Mr. Billups and Dr. Belton. *See* Am. Compl. ¶¶ 5, 6. Although

---

[10] Defendants also challenge the claim for punitive damages against the Individual Defendants sued in their official capacities. Def.'s Mem. Supp. 29. Since the claims against the Individual Defendants in their official capacities have already been dismissed, this argument need not be addressed.

the Court notes that Plaintiff names Ms. Felton and Ms. Brown in her defamation pleading, she only asserts that Mr. Billups and Dr. Belton engaged in defamatory acts. *Id.* at ¶ 216; *cf. id.* at ¶¶ 217-40. Therefore, insofar as Plaintiff brings her defamation claim against Mr. Billups and Dr. Belton in their individual capacities, Defendant's argument is moot.

Accordingly, Defendants' Motion to Dismiss Plaintiff's claims for declaratory relief is **GRANTED**, and Defendants' Motion to Dismiss Plaintiff's claim for punitive damages under Count III is **DENIED**.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss is **DENIED IN PART** and **GRANTED IN PART**. Specifically, Defendants' Motion to Dismiss Counts I and III is **DENIED**, and Defendants' Motion to Dismiss Counts II, IV, V, and VI is **GRANTED**. Further, Defendants' Motion to Dismiss Count I is **GRANTED IN PART** in so far as it states a claim against the Individual Defendants in their official capacities, and **DENIED IN PART** in so far as it states a claim against the Individual Defendants in their individual capacities. Finally, Defendants' Motion to Dismiss Plaintiff's prayer for declaratory relief is **GRANTED**, and Defendants' Motion to Dismiss Plaintiff's claim for punitive damages under Count III is **DENIED**.

Defendant is hereby **ORDERED** to file an Answer to the Amended Complaint within **FOURTEEN (14) DAYS** of the entry of this Order.

The Court **DIRECTS** the Clerk to provide a copy of this Order to the Parties.

**IT IS SO ORDERED**.

Norfolk, Virginia
November 5 , 2021

Raymond A. Jackson
United States District Judge

50